JOINT SCHOOL DISTRICT NO. 4 OF THE TOWN AND CITY OF PLATTEVILLE, Respondent, vs. BAILEY-MARSH COMPANY and another, Appellants.

*May 1—June 18, 1923.*

*Building contracts: To erect public school building: Construction by architect: When material is "furnished:" Default of contractor: Delay: Liquidated damages: Owner taking over building: Charges for superintendence: Duty of owner toward contractor's surety: Payment on contractor's orders: Construction of contract of surety.*

1. Under a contract for the construction of a school building providing for monthly payments for ninety per cent. of the value of the work done and material furnished as assessed by the architect, the latter could not arbitrarily determine what material had been furnished, and his determination was not conclusive so far as it involved the interpretation of the terms of the contract.

2. Under the specifications of the contract, material, though manufactured expressly for the building, was not "furnished" when stored in a distant city in another state and in no way subject to the control of the owner.

3. Generally, when an owner elects to take possession of and complete the work himself, pursuant to a stipulation contained in a building contract, he may not recover the sum stipulated as liquidated damages for delay in completion.

Joint School Dist. v. Bailey-Marsh Co. 181 Wis. 202.

4. Where a school district, following the contractor's default, did not assert its right to complete the contract, but only did the work under orders from the contractor covering particular portions of the work, it did not thereby lose its right to liquidated damages for the delay, but could not recover such damages after taking over the entire control and management under a blanket order for the completion of the building.

5. The contractor having defaulted and the school district having completed the work at a cost in excess of the contract price, it was entitled to interest on the excess from the date of the last payment.

6. Where the school district was compelled to employ a superintendent by reason of the contractor's abandonment of the work, his fee was a proper and necessary item of the cost of completing the contract.

7. When a creditor has the right and opportunity to apply the principal's property to the satisfaction or security of his debt, he owes the surety the duty to do so, and a release or waiver of such right to the prejudice of the surety and without his consent will discharge the surety, at least *pro tanto*.

8. The contractor having abandoned the work, no sum could become due it so as to justify, as against its surety, a payment made on the contractor's order, until, on completion of the building, it appeared that the amount reasonably expended in its completion was less than the contract price.

9. The contractor's surety, after the abandonment, had the right to require the school district to apply the remainder of the contract price to the completion of the building, and the district had no right, by accepting and paying the contractor's order in favor of a bank, to divert part of the contract fund to the payment of the contractor's general obligation, although such obligation was for money borrowed to pay laborers or materialmen.

10. The right to have the building fund applied to the completion of the building after the contractor's default and not diverted to payment of the contractor's obligations to general creditors is one which may be asserted by a surety for compensation as well as by a gratuitous surety.

11. Due to the fact that applications and surety bonds are usually prepared by corporations acting as sureties or indemnitors, the same rule of law is applied to those contracts that is applied to other contracts prepared by and for the benefit of a party.

12. The bond or contract of a surety company, given for a money consideration, is to be interpreted as other contracts, with a view to ascertaining and giving effect to the true meaning and intention of the parties thereto.

CROWNHART, J., dissents.

APPEAL from a judgment of the circuit court for Grant county: S. E. SMALLEY, Circuit Judge. *Modified and affirmed.*

On the 30th day of March, 1917, plaintiff entered into a contract with the defendant *Bailey-Marsh Company* (hereinafter called the Company) whereby the company undertook to erect, finish, and deliver to plaintiff a solid brick, concrete and stone high school building, according to certain plans, drawings, and specifications provided by the architects, the work to be done under the personal supervision of the architects, the company to furnish all labor, material, and equipment necessary to complete the building at the agreed price of $107,650. The contract did not cover heating, ventilating, plumbing, telephone system, clock system, heat regulation, and marble work in toilet and shower rooms. Payments were to be made as the work progressed upon the certificate of the architects. Shortly after the making of the contract the company entered upon its performance and the work progressed satisfactorily throughout the year 1917. Estimates for work done and material furnished during that period were prepared, architects' certificates issued, and estimates paid by the school board to the company. The last estimate was paid December 10th and was for work done and material furnished during the month of November. The method of transacting the business was as follows: Each month the company prepared an estimate which was forwarded to the architects, and these estimates, with one exception, were approved by the architects and were intended to cover ninety per cent. of the value of the work done and material furnished during the period covered by the estimate. The estimates of February and March, 1918, were, at the request of the architects' superintendent, based upon the difference between what it would cost to complete the building and the amount of material and labor furnished, figuring a very liberal amount for completion, less ten per cent. No estimate was presented for the

month of December, as it appears that the estimate for November had resulted in a slight overpayment. On February 6, 1918, the company presented an estimate and requested a certificate allowing same for the sum of $2,011.25. On March 12, 1918, the company presented another estimate and requested a certificate allowing same for $4,724.90. This latter estimate was accompanied by a letter, in which the company stated that unless estimates were promptly paid they would not proceed further with the work. The school board was further notified that work would be suspended unless payment was made, and repeated demands for payment were made by the company. On March 13, 1918, the architects wrote the company that nothing would be paid on the estimates of February 6th and March 12th for the reason there was nothing due under the contract, and stated that the labor and material included in the estimates had not been furnished within the requirements of the contract. On March 30th the company drew the fires from its boilers, discharged its men, locked the boiler room, and left the job. The controversy in regard to February and March estimates related mainly to an item for mill work, which had been specially made up at a mill in Minneapolis and which was then stored at Minneapolis, it being the claim of the architects that material stored in another state was not "furnished" within the meaning of that term as used in the contract. There was then a conference between the parties, but the company refused to resume work unless the estimates were paid. The school board then procured from the company the name of a plastering contractor and arranged with him to do the plastering. The school board also advised the company that if the company would give specific orders for items as required by the plaintiff, the latter would feel justified in hiring men and going on with the work. Specific orders were given at the request of the school board during the spring and summer of 1918. On April 23, 1918, the *New Amsterdam Casualty Company* (hereinafter called the

casualty company) served upon the school board a notice, insisting upon fulfilment by the school board of all the terms of the contract and bond with reference to payments, claims of labor and materials, etc., and notified the school board not to make further payments to the contractor or upon its order without the written consent and permission of the casualty company. No formal notice of the abandonment by the company was ever served upon the school board by the casualty company. On August 17, 1918, at the request of the school board, the company gave the school board a blanket order and formal authority to proceed with the work, the same to be without prejudice to the rights of all parties concerned. After April 11, 1918, the school board paid out for completing the building the sum of $14,630.15, being $5,497.31 more than the contract price. Included in this sum, however, was an item of $5,000 paid by the school board to the First National Bank of Platteville. The facts in regard to this will be hereafter more fully stated.

On the 21st day of December, 1920, the plaintiff began this action against the company and the casualty company to recover the sum of $5,497.31, being the amount expended by it above the contract price as stated above, and also demanded judgment for $3,410 as liquidated damages under the contract for failure of the company to complete the building on or before March 30, 1918. It was the claim of the company that it had not abandoned performance of the contract; that the plaintiff had breached its contract by failing and refusing to pay the estimates for labor performed and material furnished for the months of December, 1917, and January, February, and March, 1918. The defendant casualty company relied upon the defense of the *Bailey-Marsh Company* and alleged that by reason of the payment of the $5,000 by the school board to the First National Bank a part of the fund applicable to the building was diverted and the surety released.

The court found the facts substantially as stated; found

that the company had failed to perform its contract and to finish and deliver the building over to the plaintiff by March 30, 1918; that the plaintiff had fully performed all of the terms and conditions of the contract by it to be performed; and further found that the plaintiff had proceeded with due diligence to complete the building and had expended the sum of $5,592.31 in excess of the contract price (this included the $5,000 item before referred to); that the building was completed the early part of March, 1919.

The court further found:

"I find that on or about April 8, 1918, the defendant *Bailey-Marsh Company* gave to First National Bank of Platteville, Wisconsin, an order authorizing and directing the plaintiff to pay said bank out of any money then due or to become due to said defendant [company] under said contract the sum of $5,000 in payment of money borrowed by said defendant from said bank on January 8, 1918, for the purpose of meeting the payroll of said defendant on said contract and so used; that said order was accepted by the plaintiff, and thereafter said sum was paid said bank by plaintiff out of money due the defendant *Bailey-Marsh Company* under said contract prior to August 17, 1918."

The plaintiff was awarded judgment for the sum of $5,592.31, being the amount paid for completion of the building in excess of the contract price, and the sum of $1,400 as liquidated damages. From the judgment so entered the defendants appeal.

For the appellants there was a brief by *Gardner & Gardner* of Platteville, attorneys for the *Bailey-Marsh Company,* and *James C. Melville* of Minneapolis, of counsel, and *Olwell, Durant & Brady* of Milwaukee, attorneys for the *New Amsterdam Casualty Company;* and the cause was argued orally by *G. A. Gessner* of Milwaukee.

For the respondent there was a brief by *Murphy & Murphy* and *Kopp & Brunckhorst,* all of Platteville, and oral argument by *L. A. Brunckhorst* and *J. W. Murphy.*

ROSENBERRY, J.    The defendants earnestly contend that the plaintiff breached the contract by failing and refusing to pay the February and March, 1918, estimates.    That part of the specifications material is as follows:

"Once in each and every month during the progress of the work the owners shall pay to the contractor a sum equal to ninety per cent. of the value of the work done and material furnished during the preceding month as assessed by the architects, and the balance thirty days after the completion and acceptance of the building according to this specification."

The question is, Was the material which had been specially made up for this building and was then stored in Minneapolis "furnished" within the meaning of the contract? In this connection the case of *Smith v. Molleson,* 148 N. Y. 241, 42 N. E. 669, is cited to our attention.    The contest in that case was between the surety and the owner, and it was held that payments made by the owner on account of material which had been acquired in Nova Scotia, transported to Connecticut, there dressed, and then transported to New York, where it was set in the building, were properly made, since all of the material on which payments were made had in fact gone into the building, although the payments were made prior to the time that the material had actually been incorporated into the structure.    It does not apply here, where the material was neither shipped nor incorporated into the building.

*Tomlinson v. Ashland Co.* 170 Wis. 58, 173 N. W. 300, which holds that the architect has power to construe and define the intent and meaning of plans and specifications, does not authorize the architect to construe the contract itself, and is also cited by the company.

Necessarily, the architect in issuing his certificates had to determine what material was in fact furnished.    He could not do this arbitrarily, nor was his determination conclusive so far as it involved the interpretation of the terms of the

contract.   It is considered that material, although manu-
factured expressly for the building, which has not been de-
livered upon the premises and is in no way subject to the
control of the owner but is stored in a warehouse in a distant
city in another state, is not "furnished" within the meaning
of that term as used in the specifications.

It is further contended that the plaintiff did not prove the
reasonable and necessary cost of completing the building.
The amount disbursed by the district for the purpose of
completing the building was stipulated.   While the testi-
mony as to the reasonableness of the various items is rather
meager, it is in our opinion sufficient to sustain the finding
of the trial court.

It is the further contention of the company that, the school
board having elected to take possession of the premises and
complete the work, the plaintiff is not entitled to recover the
sum stipulated as liquidated damages.   The contract con-
tained a clause to the effect that if the contractor (the com-
pany) should refuse or neglect to furnish sufficient material
and workmen or fail to comply with its contract in certain
enumerated respects, the proprietor or its agent shall have
the right and power to enter upon and take possession of the
premises and may at once terminate the contract, whereupon
all claims of the contractor, his executors, administrators or
assigns, shall cease."

It is the general rule that where the owner elects to take
possession of and complete the work himself pursuant to a
stipulation contained in the contract, he may not recover
the sum stipulated as liquidated damages.   *Moore v. School
Dist. No. 2,* 215 Mo. 705, 115 S. W. 6; *Gilette v. Young,*
45 Colo. 562, 101 Pac. 766; 9 Corp. Jur. p. 794, § 135.

The record in this case, however, discloses that the plaint-
iff did not assert its right to take possession of the premises
and complete the contract under the clause referred to.
After the default of the company on March 30, 1918, the
plaintiff continued the completion of the building by agree-

ment between the parties, the company giving orders to cover each particular portion of the work that was done down to August 17, 1918, when a general order was given pursuant to an arrangement entered into between the parties with the consent of the surety company. It is considered that the trial court correctly allowed the sum stipulated as liquidated damages under the circumstances of this case, the amount allowed being for 140 days, from March 30, 1918, to August 17, 1918. The plaintiff was not, as claimed under its cross-assignment of error, entitled to liquidated damages after it took over the entire control and management of the work on August 17, 1918. Prior to that time the company had a right to resume work and the plaintiff controlled only such parts of the work as were covered by special orders given by the company. It is also held that the trial court correctly allowed interest for the amount lawfully paid in excess of the contract price from the date of the last payment, which was April 21, 1920.

The company further contends that the plaintiff is not entitled to recover the amount of the superintendent's fee of $1,215 paid by it after the company quit work on March 30, 1918. The employment of the superintendent was made necessary by reason of the abandonment of the work by the company. It was a proper and necessary item. The amount found by the trial court appears reasonable.

The plaintiff paid to the First National Bank of Platteville, under the circumstances quoted in the finding of the court in the statement of facts, the sum of $5,000 which the company had borrowed from the bank on January 8, 1918, upon its promissory note. The order given by the company upon the plaintiff for the payment of this amount was given on April 8, 1918, but was dated January 8, 1918. The first payment was made April 8, 1918, and the last payment was made on August 8, 1918. All of the $5,000 except the first payment was included in the disbursements made by the school board in completing the building after April 10, 1918.

It is well settled that whenever a creditor has a right and opportunity to apply property of the principal to the satisfaction or security of his debt, he owes to the surety a duty to do so, and release or waiver of that right to the prejudice of the surety and without his consent will discharge the surety, at least *pro tanto.* *Pauly Jail B. & M. Co. v. Collins,* 138 Wis. 494, 120 N. W. 225.

It is contended by the plaintiff, however, that this money became due to the company and that under the terms of the contract it was payable to the company or its assigns, and that payment made pursuant to the order given by the company was a payment to the assigns of the company, and, being a payment in accordance with the terms of the contract, the surety cannot object thereto. The difficulty with this argument is that it rests upon a false premise. As has already been pointed out, the company did no work under the contract after March 30, 1918. It abandoned the work, and such work as was thereafter done was done by and under the direction of the plaintiff. The company being in default, performing no further service or furnishing no material, no sum could become due it until, upon the completion of the building, it appeared that the amount reasonably expended in the completion of the building was less than the remainder of the contract price. The surety, under the principle of law stated, had a right to require the plaintiff to apply the remainder of the building fund to the completion of the building, and the plaintiff had no right, by the acceptance and payment of the order of April 8, 1918, to divert any part of the contract fund to the payment of a general obligation of the company without the consent of the surety. It is immaterial that all or some part of the money loaned by the bank to the company upon its note was used by the company for paying off the claims of laborers or materialmen. The bank having accepted the note of the company, its relation to the company was that of a general creditor. This principle is well stated in *Henningsen v. U. S. F. & G.*

*Co.* 143 Fed. 810, affirmed 208 U. S. 404, 28 Sup. Ct. 389, where it is said, under circumstances quite similar to those in this case:

"Whatever equity, if any, the bank had to the fund in question arose solely by reason of the loans it made to Henningsen. Henningsen's surety was, upon elementary principles, entitled to assert the equitable doctrine of subrogation; but it is equally clear that the bank was not, for it was a mere volunteer, and under no legal obligation to loan its money."

So long as the company was not in default and continued to perform its contract, the plaintiff was under no obligation to see that the amounts paid to the company were applied to the extinguishment of claims for which the surety might thereafter become liable; but when the company defaulted and refused to further perform, the surety had a right to have the remainder of the building fund applied to the completion of the building and to the discharge of claims for which it might thereafter become liable. The indebtedness due to the bank upon the company's note was not such a claim. By the payment of the note the sum of $5,000 was diverted from the building fund to the prejudice of the surety, and the surety was thereby released *pro tanto.*.

The plaintiff cannot claim in this case that there was any amount due to the *Bailey-Marsh Company* on the 8th day of April, 1918, when this order was given. It consistently maintained the position throughout that there was nothing due, and refused to pay the February and March estimates for that reason. The company abandoned the work on March 30, 1918, because of the refusal of the district to pay what the company claimed was justly due it under the February and March estimates. The trial court sustained the position of the plaintiff and held that there was nothing due it, and the decision of the trial court in that respect is sustained here. There remains then no basis for an argument that the payment of the $5,000 note was out of funds

due to the company, there being nothing due at the time it abandoned the work. It having performed no work and delivered no material thereafter, and being in default as already pointed out, nothing could be due it or its assigns until the building was completed.

The case of *Royal Ind. Co. v. Northern G. & S. Co.* 100 Ohio St. 373, 126 N. E. 405, 12 A. L. R. 378, and cases cited in the note appended thereto, are called to our attention in support of the proposition that the rule of strict construc tion ordinarily applied in favor of private voluntary sureties does not apply to that class of sureties which, for a pecuniary consideration, undertakes to indemnify an owner of a construction against the defaults of the principal contractor. The rule invoked has no application to the facts in this case. We are not concerned here with the construction of the contract between the surety and the beneficiary. We are concerned with the application of the general principles of law which apply to the relation of suretyship, which is admittedly established. The right to have the building fund applied to the completion of the building is a right which may be asserted by a surety for compensation as well as a gratuitous surety, and, as already stated, the rule rests upon sound equitable principles. The surety does not agree to perform the contract. The surety agrees to indemnify the obligee with whom his principal has contracted in the event of the principal's default. The measure of the surety's liability, therefore, was the difference between the amount reasonably and necessarily expended in completion of the contract by the plaintiff and the unexpended remainder of the contract price. The plaintiff could not, by diverting a part of the unexpended balance of the contract price to purposes other than completion of the building, in effect require the surety to become liable for the obligations of the company to a general creditor.

As is pointed out in Spencer on Suretyship, § 90, the statement that the undertaking of a surety is *strictissimi*

*juris* and that a strict construction in favor of the surety of the language employed should be adopted and all doubts resolved in his favor, is scarcely a correct statement of the modern rule. See 1 Brandt, Suretyship (3d ed.) § 103 and cases cited; *Builders L. & S. Co. v. Chicago B. & S. Co.* 167 Wis. 167, 166 N. W. 320.

Due to the fact that modern corporations have undertaken the business of becoming sureties and indemnitors, that under such circumstances the applications and bonds are usually prepared by the surety, the same rule of law is applied to those contracts that is applied to other contracts which are prepared by and for the benefit of a party. While it is stated in many opinions that the rules of interpretation applicable to contracts of a gratuitous surety are not to be applied in a case of a surety for compensation, it is meant that a different rule of law is applicable because the changed situation makes it applicable. This court has held that where a bond is given for a money consideration it has all the essential features of an insurance contract and is therefore not to be construed according to the rules of law applicable to the contract of an ordinary accommodation surety. *Builders L. & S. Co. v. Chicago B. & S. Co.* 167 Wis. 167, 166 N. W. 320.

Such contracts are to be interpreted as are other contracts, with a view to ascertaining and giving effect to the true meaning and intention of the parties. 1 Brandt, Suretyship (3d ed.) § 103 and cases cited; Spencer, Suretyship, § 90 and cases cited.

It is also contended that the plaintiff failed to require certificates that there were no outstanding claims before the payment of estimates. It is not shown, however, that the surety was in any way prejudiced by the failure of the architect to require such certificates. We have already considered the question of whether or not the plaintiff was in default by reason of the refusal to pay the February and March estimates.

Joint School Dist. v. Bailey-Marsh Co. 181 Wis. 202. Dissent.

*By the Court.*—Upon the appeal of the defendant *Bailey-Marsh Company* the judgment of the circuit court is affirmed. Upon the appeal of the defendant *New Amsterdam Casualty Company* the judgment is modified by striking therefrom the sum of $5,000 and interest from the date of the last payment, and as so modified the judgment is affirmed; the appellants to recover their costs in this court.

CROWNHART, J. (*dissenting*). The surety contract was for pay, and the old rules of gratuitous surety do not apply. A surety for a consideration is held to be an insurer of the performance of the principal contract. *Milwaukee B. S. Co. v. Illinois S. Co.* 163 Wis. 48, 157 N. W. 545; *Builders L. & S. Co. v. Chicago B. & S. Co.* 167 Wis. 167, 166 N. W. 320.

The principal contract here called for the building of a school house according to specifications of the architect within a given time, payments to be made to the contractor or his assigns on the certificates of the architect.

The building was not completed on time, but the contractor continued work on the building through its superintendent and subcontractors four and a half months from the date of the expiration of the contract, and then with the consent of the surety turned the building over to the school district for completion. On January 8, 1918, the contractor made a short-time loan of the First National Bank of Platteville to meet its payrolls and other bills incurred under its building contract. The money so borrowed was for the benefit of the surety as well as the school district plaintiff. On April 8th following, the contractor gave an order on the plaintiff to pay the bank out of any moneys due or to become due it under the contract. The plaintiff accepted the order and thereafter, upon certificates of the architect, it paid the bank just as provided under the terms of its contract. This court now holds that the plaintiff should have withheld that money for the benefit of the

surety.  Why?  The contracts of the principal and surety did not so provide.

The plaintiff acted with patience and the utmost good faith with the contractor and the surety.  Neither the contractor nor surety in good faith complied with their contracts after it became apparent that the contracts would be unprofitable.  They laid down on the job and went begging to the plaintiff for charity amounting to from $7,000 to $10,000.  The surety now insists that the plaintiff should stand the loss that it has assumed for pay.  As I see it, the court relieves the surety from its contract without warrant of law, and places the burden of loss upon the plaintiff contrary to its contract with the surety.  See 9 Corp. Jur. 861.

For these reasons I respectfully dissent.