**FIRST FEDERAL STATE BANK, Appellee and Cross-Appellant,**

v.

**The TOWN OF MALVERN, John F. Kemp, Woodford Byington, N. D. Pierce, Douglas Burchett, Temple Bowers, LeRoy Viner, and Dale L. Stephens, Defendants.**

**TOWN OF MALVERN, Cross-Petitioner,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, Appellant and Cross-Appellee.**

**No. 2–61248.**

Supreme Court of Iowa.

Oct. 18, 1978.

Lyle W. Ditmars and Peter J. Peters, of Peters, Campbell & Pearson, P. C., Council Bluffs, for appellant and cross-appellee.

James L. Sayre, of Dreher, Wilson, Adams & Jensen, Des Moines, for appellee and cross-appellant.

ALLBEE, Justice.

This is a contest between the surety of a contractor who defaulted in the performance of a public construction project and the bank to which the contractor assigned its contract rights. The prize is a fund consisting of the remainder of progress payments which the contractor had earned but had not received and certain retained percentages.

The parties have stipulated to the facts. On August 29, 1972 the Town of Malvern contracted with South Pacific Pools, Inc. to build a swimming pool for $79,480. Pursuant to the requirements of chapter 573, The Code, United States Fidelity and Guaranty Company became surety for the contractor by providing performance and payment bonds dated August 29. First Federal State Bank entered into security agreements with the contractor on November 9, 1972 and July 13, 1973, taking assignments of the contractor's contract rights, accounts and proceeds arising out the Malvern pool contract. The associated financing statements were filed on October 16, 1972 and July 16, 1973. Notice of the second assignment was given to the town on July 13, 1973.

On August 29, 1972 the contractor began performing the contract. As performance progressed, payments were made, and a percentage of the earned money was retained, according to the provisions of § 573.-12, The Code. That section provides:

> Payments made under contracts for the construction of public improvements, unless provided otherwise by law, shall be made on the basis of monthly estimates of labor performed and material delivered. In making said payments, there shall be retained ten percent of each said monthly estimate by the public corporation; provided, however, that if the contract is for more than fifty thousand dollars and if the public corporation at any time after fifty percent of the improvement has been completed finds that satisfactory progress is being made, the public corporation may authorize any of such remaining payments to be made in full.

Through July 4, 1973, the town had paid $53,985 on the contract. The contractor had earned another progress payment of $5829, but that payment had not been made prior to default on August 6, 1973. After default, the surety and the town entered into an "Agreement on Contract Funds." The surety then completed the project at a total cost of $65,385.40 and the town paid certain unspecified claims of $4747. After completion the town paid $10,248 to the surety. All parties agreed that the town was entitled to keep $4747 as reimburse-

ment for the claims it paid. Thus $10,500 was left, that amount being the contract price ($79,480) less the following: (1) the amount paid to the contractor before default ($53,985); (2) the amount paid to the surety after completion ($10,248); and (3) the amount set off to the town ($4747). This remaining fund is the subject of dispute. The town paid the $10,500, to which it made no claim, into the clerk of court, leaving only the bank and the surety as parties to this controversy.

The bank claimed the remaining fund as the assignee of the contractor's rights in the contract. The surety made claim to the fund solely on the theory that it is subrogated to the rights of the town because it completed the project and expended a sum far in excess of the amount now in controversy. Trial court awarded $5829 to the bank because that amount was due the contractor prior to default. The remaining $4671 was found to be the balance of the funds retained under § 573.12, The Code, for payment of material and labor claims and was therefore awarded to surety. From that judgment the surety appealed and the bank cross-appealed.

It is first necessary to establish what is and is not involved in this case. The surety has the possibility of assuming several different roles, for, as was pointed out by the leading case, *National Shawmut Bank v. New Amsterdam Cas. Co.*, 411 F.2d 843, 845 (1st Cir. 1969):

> [T]he surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety—who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

Here, the surety asserts only its rights as subrogee to the town. *See Toll v. Toll*, 201 Iowa 38, 41, 206 N.W. 117, 118 (1925); *see also Ohio Cas. Co. v. Galvin*, 222 Iowa 670, 672, 269 N.W. 254, 256 (1936).

Because the surety does not claim as subrogee to the contractor's rights, *Monona County v. O'Connor*, 205 Iowa 1119, 1125–26, 215 N.W. 803, 806 (1927) does not apply. That case placed the surety, by its right of subrogation to its principal's rights, prior to the claim of the contractor's assignee who had rented horses and equipment to the contractor.

Nor does the surety base its claim on the rights it has as subrogee to the claims of laborers and materialmen. Therefore, *Hercules Mfg. Co. v. Burch*, 235 Iowa 568, 16 N.W.2d 350 (1944) and *Sinclair Refining Co. v. Burch*, 235 Iowa 594, 16 N.W.2d 359 (1944) have no direct application. The surety in those cases relied entirely upon its rights as subrogee to laborers and materialmen, without asserting any rights as subrogee of the owner. *Hercules*, 235 Iowa at 578, 16 N.W.2d at 355.

The surety makes no claim under any assignment which might be included in either bond. Therefore, we find no assistance in *Coon River Co-op Sand Assoc. v. McDougall Const. Co.*, 215 Iowa 861, 244 N.W. 847 (1932), which subordinated the assignee-surety to the assignee-bank because the surety's assignment was conditioned on the contractor's breach and therefore attached after the bank's assignment.

Finally, no one contends that priorities are governed by Article 9 of the Uniform Commercial Code (UCC). It seems to be settled in other jurisdictions that Article 9 does not govern where a surety asserts subrogation rights. *See, e. g., Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492 (1971); *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965).

■ Article 9 of the UCC is not entirely irrelevant, however, for the bank's assignment is a perfected security interest. The bank's position is thus defined by § 554.-9318(1)(a), The Code. Its rights are essentially the same as what existed under prior law. *See Associates Discount Corp. v. Goetzinger*, 245 Iowa 326, 62 N.W.2d 191 (1954); *Monona County v. O'Connor*, 205

Iowa 1119, 1125–26, 215 N.W. 803, 806 (1927). That is to say that the assignee acquired only such rights as the contractor had in the fund. "The claims of the assignee are no higher or greater than those of the contractor." *Monona County,* 205 Iowa at 1126, 215 N.W. at 806.

An examination of the parties' positions in light of the foregoing discussion indicates that, when stripped to its essentials, this dispute may be resolved as though it involved the town against the contractor. Having established the boundaries of the contest, we now turn to the parties' specific complaints.

## I. The Bank's Cross-Appeal.

Because the issue raised by the cross-appeal is relatively simple, we take up this subject first. The bank asserts it has a right to the entire $10,500 fund, even including the portion beyond that which was made up of earned but unpaid progress payments. In other words, the bank is attempting to collect money which the contractor has not earned. Relying upon *Sinclair Refining Co. v. Burch,* 235 Iowa 594, 16 N.W.2d 359 (1944), which holds that only the 10% retainage fund is available for payments to laborers and materialmen, the bank points out that the surety has already received more than 10% of the entire contract price. Therefore, the bank reasons, it must be entitled to everything else. This argument fails to take into account the rights of the town, to which the surety is claiming to be subrogated.

■ Section 573.12, The Code, makes it clear that the contractor had no right to receive any payments after its default. That section provides "[p]ayments . . . shall be made on the basis of monthly estimates of labor performed and material delivered." Since no labor was performed and no material was delivered after the default, there was no further right to payment. *See also* 3A Corbin on Contracts § 692, at 273 (1960) ("Failure to do the work that is necessary to secure the architect's certificate justifies nonpayment of a subsequent installment."). The town, therefore,

had the right to retain all unearned progress payments. And, of course, the contractor can assert no claim to the 10% retainage in light of the fact that far more than that sum went to pay laborers and materialmen. *See Sinclair Refining Co. v. Burch,* 235 Iowa 594, 16 N.W.2d 359 (1944).

Therefore, because the contractor could have no possible claim to any fund beyond the $5829 in earned but unpaid progress payments, and because the surety, through the town, had a right to all contract payments unearned by the contractor, we affirm on the assignee-bank's cross-appeal.

## II. The Surety's Appeal.

■ On this side of the case, the surety claims entitlement to the entire fund as subrogee to the rights of the town as owner of the swimming pool. The bank's response is to argue that the surety's leading cases, *National Shawmut Bank v. New Amsterdam Cas. Co.,* 411 F.2d 843 (1st Cir. 1969) and *Finance Co. of America v. United States Fid. and Guar. Co.,* 277 Md. 177, 353 A.2d 249 (1976), do not apply to this case because chapter 573 of the Code governs the conflict. It asserts that no similar statute was involved in the cases which the surety relies upon.

Of course, in both cases the surety bond was required by statute. *National Shawmut,* 411 F.2d at 844; *Finance Co.,* 353 A.2d at 250. We pass the question of similarity in the various statutes, however, to consider whether, by its own language, chapter 573 affects the conflict at hand.

The bank first contends that the town was required by § 573.15 to pay the earned but unpaid progress payment to the contractor. Section 573.15 provides:

No part of the unpaid fund due the contractor shall be retained as provided in this chapter *on claims for material furnished,* other than materials ordered by the general contractor or his authorized agent, unless such claims are supported by a certified statement that the general contractor had been notified within thirty days after the materials are furnished or

by itemized invoices rendered to contractor during the progress of the work, of the amount, kind, and value of the material furnished for use upon the said public improvement, and no part of such unpaid fund due the contractor shall be retained as provided in this chapter because of the commencement of any action by the contractor against the Iowa state department of transportation under authority granted in section 613.11. (emphasis added)

This section was the subject of discussion in *Sinclair*, 235 Iowa at 598, 16 N.W.2d at 362. There the question was what the phrase "unpaid fund due the contractor" meant. The disposition of the instant argument, however, rests on the phrase "on claims for material furnished." We deal here with the rights of the town against the contractor. Section 573.15, by the phrase just quoted, refers only to the claims of materialmen. The claims of materialmen (as well as laborers) were, of course, the subject with which *Sinclair* dealt. The section simply has no application to a dispute between the town and the contractor over progress payments which are earned before the contractor's default. Nothing in chapter 573 would apply to this dispute. This conclusion is not surprising, in light of chapter 573's title: Labor and Material on Public Improvements.[1]

With the question of whether chapter 573 governs answered, this case closely parallels *National Shawmut*. The town of Malvern had the right to keep the earned but unpaid progress payments, at least where the excess cost of completion was greater than those earned payments. *National Shawmut*, 411 F.2d at 848, citing *American Bridge Co. v. City of Boston*, 202 Mass. 374, 88 N.E. 1089 (1909). Because any dispute between town and contractor would therefore be resolved in the town's favor, the surety, as the town's subrogee, must prevail.

On remand, trial court shall enter judgment for the entire $10,500 fund in favor of the surety.

Reversed on the appeal, affirmed on the cross-appeal, and remanded.

All Justices concur except UHLENHOPP, J., who takes no part.

---

1. Rejection of the bank's argument that chapter 573 controls does not inevitably lead to the result which the surety proposes, however. The assignee was given priority in *Reliance Ins. Co. v. First Miss. State Bank*, 263 So.2d 555 (Miss.1972). But that case did not consider the argument which the surety advances here. Another theory for resolving disputes of this nature which might benefit banks in some cases has been suggested by a commentator. *See* E. Dauer, Government Contractors, Commercial Banks, and Miller Act Sureties—A question of Priorities, 14 B.C. Ind. & Comm.L.Rev. 943 (1973). We do not consider the possibility of applying either of these views here. The parties have not argued for their application, nor have they produced an evidentiary record appropriate for the possible application of these theories.