**BANK OF WAUNAKEE, a Wisconsin banking corporation, Plaintiff–Appellant,**

v.

**ROCHESTER CHEESE SALES, INC., a Minnesota corporation, Defendant–Appellee.**

No. 89–2110.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1990.

Decided July 13, 1990.

**1186**

Robert Brill, Francis Eustice, Brill & Eustice, Sun Prairie, Wis., for plaintiff-appellant.

Bruce M. Davey, Lawton & Cates, Madison, Wis., for defendant-appellee.

Before WOOD, Jr. and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff–appellant Bank of Waunakee ("the Bank") appeals the district court's order granting defendant-appellee Rochester Cheese Sales, Inc.'s motion for summary judgment on the Bank's claim for collection of an account receivable. The Bank also appeals the district court's Order denying the Bank's Motion for Reconsideration, in which the Bank asserted that the court should vacate its earlier order and allow the Bank to pursue a conversion claim despite its failure to plead a conversion claim in its complaint.

### I. FACTUAL BACKGROUND

Defendant-appellee Rochester Cheese Sales, Inc. ("RCS") is a Minnesota corporation that buys and resells cheese. Waunakee Kase Haus, Inc. ("Kase Haus") was in the business of purchasing and reprocessing various types of cheeses under its own label. As part of their business, RCS and Kase Haus each purchased cheese from particular sources and sold different types of cheese to these same sources. RCS and Kase Haus shared such a business relationship in 1987.

Kase Haus bought $46,970.47 worth of cheese from RCS on March 22, 1988; $50,094.59 worth of cheese on April 1, 1988; and $22,417.42 worth of cheese on May 24, 1988. Kase Haus wired $22,000.00 to RCS in May 1988 as partial payment. RCS purchased $41,863.55 worth of cheese from

Kase Haus on May 6, 1988, and $80,326.20 worth of cheese on May 11, 1988. Larry Oliver, Kase Haus's manager, had the authority to make the sales to and purchases from RCS.

On June 10, 1988, Don Roberts, acting on behalf of RCS, initiated a telephone conference with Larry Oliver of Kase Haus to review the various outstanding invoices between RCS and Kase Haus. Roberts and Oliver determined that, taking into account all outstanding invoices, credits, shipping charge adjustments, weight adjustments, and payments received, RCS owed Kase Haus the total net sum of $22,643.69. On the same day, RCS issued and mailed a check to Kase Haus for the sum of $22,-643.69 with the notation on the check register delivered with the check that the check "PAID IN FULL" the amount RCS owed Kase Haus. Kase Haus negotiated the RCS check without objection.

Several months before the transactions between Kase Haus and RCS, Kase Haus borrowed money from the Bank under several loan agreements. Kase Haus subsequently defaulted on its obligation under its loan agreements with the Bank. At the time the Bank filed its complaint, Kase Haus owed the Bank a sum in excess of $1,434,585.30. The Bank had a perfected security interest in Kase Haus's inventory and accounts receivable that provided in part:

> VERIFICATION AND NOTIFICATION. Bank may verify Collateral in any manner, and Debtor shall assist Bank in so doing. *Upon default Bank may at any time and Debtor shall, upon request of Bank, notify the account debtors to make payment directly to Bank and Bank may enforce collection of, settle, compromise, extend or renew the indebtedness of such account debtors. Until account debtors are so notified, Debtor, as agent for Bank shall make collections on the Collateral....*

(emphasis added). Prior to the transactions between RCS and Kase Haus, the Bank assigned its interest in Kase Haus's accounts receivable to another lender, CFC Capital Corporation ("CFC"). Kase Haus reported to CFC on the status of its accounts receivable on a weekly basis. CFC would then wire funds to Kase Haus through the Bank. CFC continued to advance money to Kase Haus throughout June 1988. When the Bank declared Kase Haus in default, it immediately notified CFC. The Bank purchased CFC's rights to Kase Haus's accounts receivable during August 1988.

On July 21, 1988, the Bank notified RCS that it expected RCS to make payments to the Bank for the amount it allegedly owed Kase Haus. RCS received a letter dated July 18, 1988, from the Bank's attorney that stated in part:

> This brings us to the account of Rochester Cheese Sales as it is reflected on the records of Waunakee Kase Haus, Inc. and to the point of this correspondence. Account records reflect that on and between May 6, 1988 and May 11, 1988, Rochester Cheese Sales acquired cheese from the inventory of Waunakee Kase Haus, Inc. having a total value of $120,126.17. At this time, Waunakee Kase Haus, Inc. was indebted to Rochester Cheese Sales for purchases on account totalling $75,065.00. On June 9, 1988, this indebtedness increased to $97,-482.48 reflecting a purchase made by Waunakee Kase Haus, Inc. on that date. It appears that on or after June 9, 1988, Rochester Cheese Sales tendered a check to Waunakee Kase Haus, Inc. for $22,-643.69 and set off its accounts payable to Waunakee Kase Haus, Inc. with its account receivable from Waunakee Kase Haus, Inc. In so doing, it converted the collateral of the Bank of Waunakee to the extent of the amount of the set off; [*sic*] $97,482.48.
>
> We are provided with no information that Rochester Cheese Sales at any time owned a security interest in the inventory of accounts of Waunakee Kase Haus, Inc. to secure payment of the account of Waunakee Kase Haus, Inc. Therefore, clearly, Rochester Cheese Sales was no more than a general, unsecured creditor of Waunakee Kase Haus, Inc. at the time of the set-off. Since the right of set-off in a creditor who does not have a securi-

ty interest does not abrogate the security interest of a secured creditor, the offset taken by Rochester Cheese Sales was, in fact, a conversion. As such, Rochester Cheese Sales remains indebted to the Bank of Waunakee for the sum of $97,-482.48.

On November 10, 1988, the Bank filed a complaint against RCS that contained a solitary claim for the collection of accounts receivable. In its preliminary pretrial report, the Bank reasserted that its complaint sought to collect an account receivable. On March 15, 1989, RCS moved for summary judgment on the Bank's claim for the collection of accounts receivable. The Bank also filed a motion for summary judgment on April 4, 1989, asserting that it was entitled to judgment on a claim that RCS had converted inventory (the cheese it had received from Kase Haus) in which the Bank had a security interest and also on its claim that "as assignee of Waunakee Kase Haus" it was entitled to payment on the account RCS owed to Kase Haus. In its complaint, the Bank alleged that Kase Haus "conveyed" certain personal property, including Kase Haus's accounts receivable, to the Bank under the terms of the security agreement executed by Kase Haus. The conversion of inventory claim was mentioned nowhere in the Bank's complaint, and the Bank never sought leave to amend its complaint to add a conversion claim of any kind pertaining to either accounts receivable or inventory. RCS opposed the Bank's summary judgment motion on the grounds that the Bank had never pled the conversion claim, the motion was not timely, and the undisputed material facts did not support the claim.

The district court granted RCS's summary judgment motion and denied the Bank's cross-motion for summary judgment, noting that a cause of action for conversion of collateral of any kind was contained nowhere in the complaint; rather, the complaint simply alleged that the Bank sought to collect an account receivable. The district court found that there were no material facts in dispute and that RCS as an account debtor was entitled to set off amounts Kase Haus owed it against the amount it owed Kase Haus pursuant to section 409.318(1)(b) of the Wisconsin Uniform Commercial Code. In its opinion denying the Bank's subsequent motion for reconsideration, the trial court noted that "even with the most liberal construction [of the complaint] plaintiff has come nowhere within haling [*sic*] distance of stating a claim for conversion of inventory." The district court further stated that even though the Bank's July 18, 1988, letter informed RCS that the Bank believed it had a valid conversion claim, the court was "aware of no authority which requires that issues at trial be framed by letters exchanged between the parties at some time prior to litigation."

## 11. ANALYSIS

The Bank alleges that the trial court erred in entering summary judgment on RCS's behalf on the grounds that (1) the documents it executed with Kase Haus did not constitute an assignment; (2) even if the Bank became a "de facto assignee" upon Kase Haus's default, section 408.-318(1)(b) would not apply because the Bank did not acquire all right, title, and interest in Kase Haus's accounts receivable; and (3) the district court should have construed its motion for reconsideration as a motion for leave to amend the complaint to convert the underlying cause of action to one for conversion.

We review the district court's decision to grant summary judgment de novo and use the same standard of decision making as that employed by the district court. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir.1989). Therefore, we will only affirm the grant of summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c).

## A. *RCS's Right to Set Off*

■ Section 409.318(1) of the Wisconsin Uniform Commercial Code provides:

(1) Unless an account debtor has made an enforceable agreement not to assert

defenses or claims arising out of a sale as provided in s. 409.206 the rights of an assignee are subject to:

(a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment. WIS.STAT. § 409.318(1). The Bank asserts that section 409.318 is inapplicable because the Bank's security interest in Kase Haus's accounts receivable was not an assignment of those accounts as collateral. Settled case law, however, contradicts both the Bank's allegation that section 409.318(1) does not apply and its post-summary judgment characterization of itself as anything less than an assignee of Kase Haus's accounts receivable. *In Matter of Don's Elec., Inc.,* 65 B.R. 399 (Bkrtcy.W.D.Wis. 1986), the lending bank had a perfected security agreement giving it a security interest in a construction contractor's (Don's Electric, Inc.) accounts receivable. After the contractor went into bankruptcy, the bank filed an action to recover amounts owed the contractor against a subrogee to the project owners who had asserted a right to set off. The bank contended that its security interest had priority over the subrogee's right to set off. The bankruptcy court dismissed the bank's claim and noted:

Under the law [WIS.STAT. § 409.318(1)] the assignee of an account obtains nothing more than the assignor had, and all defenses which could have been raised by the account debtor against the assignor are available against the assignee. *See Gould v. Jackson,* 257 Wis. 110, 42 N.W.2d 489 (1950); *Morris F. Fox & Co. v. State,* 229 Wis. 44, 49, 281 N.W. 666 (1938); *Michalak v. Nowinski,* 220 Wis. 1, 7, 264 N.W. 498 (1936). The assignee stands exactly in the shoes of his assignor. *Gould, supra,* 257 Wis. at 112–13, 42 N.W.2d 489. *See also Allison v. Manzke,* 118 Wis. 11, 94 N.W. 659, 662 (1903). *Accord First Federal State Bank v. Town of Malvern,* 270 N.W.2d 818 (Iowa 1978) (bank to which a defaulting contractor had assigned its rights prior to default acquired only such rights as the contractor had in unpaid progress payments and retainages). *Thus, while the bank's security interest attaches to the accounts and their proceeds (WIS. STAT. § 409.203), the security interest is subject to all counterclaims, defenses and set-offs which the project owners could assert against Don's.* It cannot be doubted that the project owners had the right to set off the expense of completing the work left unfinished by Don's against any amounts owing under the contracts. That is the principal purpose of the retainages. By virtue of completing the projects USF & G is subrogated to the position of the owners and acquires all the rights, defenses and claims which the owners could have asserted against Don's.

65 B.R. at 403 (footnote omitted) (emphasis added).

A district court arrived at an identical conclusion when applying the Illinois statute that is equivalent to the Wisconsin statute in circumstances similar to those that this case presents. *See BarclaysAmerican/Business Credit, Inc. v. Paul Safran Metal Co.,* 566 F.Supp. 254 (N.D.Ill.1983). BarclaysAmerican/Business Credit, Inc. ("Barclays") had a security interest in the accounts receivable of Interstate Smelting & Refining Co. ("Interstate") under a loan agreement. Interstate and Paul Safran Metal Company ("Safran") had business dealings with each other that resulted in the creation of mutual accounts receivable. Interstate defaulted on its loan with Barclays, and Barclays notified Safran that its account receivable with Interstate should be paid directly to Barclays. Safran contended that under ILL.REV.STAT. ch. 26, § 9–318(1), which is identical in all respects to WIS.STAT. § 409.318(1), it should be allowed to set off its claim against Interstate. The district court ruled in Safran's favor and found that Safran could set off the amount Interstate owed it against Barclays's security interest in Interstate's accounts receivable. *Id.* at 257. *See also*

*United Cal. Bank v. Eastern Mountain Sports,* 546 F.Supp. 945, 963–64 (D.C.Mass. 1982) (account debtor allowed to set off claims for defective goods against its account receivable in which a bank had a perfected security interest), *aff'd,* 705 F.2d 439 (1st Cir.1983); *In re Chase Manhattan Bank v. State,* 40 N.Y.2d 590, 594, 357 N.E.2d 366, 369, 388 N.Y.S.2d 896, 899 (1976) (constructive notice provided by perfection of a security interest by filing a financing statement under the Uniform Commercial Code ("UCC") does not suffice to preclude an account debtor's right to set off subsequent debts).

For purposes of section 409.318 and the equivalent statute in other states, the courts and the UCC have made no distinction between a party with a security interest in a debtor's accounts receivable and a party who is an assignee of a debtor's accounts receivable. Section 409.502 of the Wisconsin Uniform Commercial Code, which specifies the collection rights of a party with a security interest in collateral consisting of an account, chattel paper, contract right, general intangible, or instrument, states in part:

> When so agreed and in any event on default the secured party is entitled to notify an account debtor or the obligor on an instrument to make payment to him whether or not *the assignor* was theretofore making collections on the collateral, and also to take control of any proceeds to which he is entitled under s. 409.306.

WIS.STAT. § 409.502(1) (emphasis added). The UCC, which "is not a comprehensive codification of commercial law," 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 2, at 6 (3d ed.1988), does not define "assignment." Nonetheless, treatment under section 409.318 of one with a security interest in an account receivable as an "assignee" of the account receivable is consistent with section 409.502's implicit description of a secured party who exercises his rights to collect on an "assignor's" accounts receivable as an assignee. The benefits that a secured creditor enjoys from the summary default remedy contained in section 409.-502 are counterbalanced by the account debtor's right under section 409.318 to confront the secured creditor/assignee with any defenses or claims it had against the assignor. If we accepted the Bank's strict rules of construction for interpreting section 409.318, we also would have to find that the summary remedy in section 409.-502 for one with a security interest in an account receivable is only available when the debtor is an "assignor" as strictly defined by the Bank.

■ The Bank's argument that it has priority to Kase Haus's assets because it perfected its security interest by prompt filing is inapposite. While a secured party who properly and promptly files thereby protects its security interest to the maximum possible extent, such protection is not absolute. For example, a perfected security interest is subordinate to the interest of a buyer in the ordinary course of business, even when the buyer is aware of the security interest. *See* WIS.STAT. § 409.307. Furthermore, a holder in due course of a negotiable instrument, a holder to whom a negotiable document of title has been duly negotiated, and a bona fide purchaser of a security take priority over an earlier security interest even though perfected. *See* WIS. STAT. § 409.309. As the New York Court of Appeals noted in *In re Matter of Chase Manhattan Bank,* 40 N.Y.2d at 593, 357 N.E.2d at 369, 388 N.Y.S.2d at 898, "the 'first to file' rule, designed to resolve situations where secured parties are competing in asserting superior rights, should not be controlling when the dispute is between a secured party and an account debtor." *See also Central State Bank v. State,* 73 Misc.2d 128, 129–30, 341 N.Y.S.2d 322 (N.Y.Ct.Cl.1973) (situation where account debtor sought set-off against secured creditor's claim to debtor/assignor's accounts receivable is "not a situation where two creditors with perfected interests are competing to subordinate the other's right to attach proceeds belonging to and held by the debtor"; account debtor may assert right to set off under UCC § 9–318).

■ The UCC counsels against hypertechnical rules of construction that undermine the UCC's underlying purposes and

policies. Section 401.102 states that "Chapters 401 to 409 shall be liberally construed and applied to promote its underlying purposes and policies," which include efforts to "simplify, clarify and modernize the law governing commercial transactions." WIS.STAT. § 401.102(1)–(2). Commentators have noted that a further purpose of the UCC is "simply that the law of commercial transactions be, so far as reasonable, liberal and nontechnical." 1 J. WHITE & R. SUMMERS, *supra*, at 14. We believe that our interpretation of section 409.318 approximates these objectives and sensibly reconciles the benefits to secured creditors/assignees found in section 409.-502 with the safeguards available to account debtors under section 409.318. Under the Bank's proposed rendering of section 409.318, an account-debtor restaurant with a right to set off against the accounts receivable of a restaurant supplier would face the prospect of paying twice for its supplies in the event that the supplier defaults on a loan secured by a bank's security interest in the supplier's accounts receivable. A more sensible result would ensue from our reading of sections 409.318 and 409.502: the restaurant's claim against the assignor/supplier is set off against the bank's summary demand for payment on the assigned account. We therefore reject the Bank's claim that RCS may not rightfully raise the defense of set-off under section 409.318.

■ Subsection (1) of section 409.318 of the Wisconsin Uniform Commercial Code provides that an assignee's rights are subject to any defenses or claims of the account debtor arising out of the contract between the account debtor and the assignor, and "any other defense or claim of the account debtor against the assignor *which accrues before the account debtor receives notification of the assignment.*" (emphasis added). Subsection (26) of section 401.-201 provides in part that "[a] person 'receives' a notice or notification when (a) it comes to his attention; or (b) it is duly delivered at the place held out by him as the place for receipt of such communications." Thus, in order to preclude RCS's right to set off under section 409.318, the Bank would have been obliged to notify RCS that it was the assignee of Kase Haus's accounts receivable. *See* 9 W. HAWKLAND, UNIFORM COMMERCIAL CODE SERIES § 9–318:03, at 304–05 (1986). RCS first received notification from the Bank that it was the assignee of Kase Haus's accounts receivable and that RCS therefore was obliged to pay the Bank for any indebtedness arising from its transactions with Kase Haus on July 18, 1988. RCS's claim against Kase Haus arose and was settled well before RCS received the Bank's July 18, 1988, collection letter. The district court therefore did not err when it found that the protections of § 409.318 were available to RCS.

## B. *Plaintiff's Covert Conversion Claim*

■ The Bank alleges that lurking in its complaint was a claim for conversion of collateral and not a claim for collection of accounts receivable. The Bank also asserts that the district court should have construed its motion for reconsideration, which was prompted by the district court's entry of summary judgment in RCS's favor on the Bank's claim for collection of accounts receivable, as an implicit motion for leave to amend the complaint to include a conversion claim.

A motion for reconsideration performs a valuable function where

> the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va. 1983). Justice Cardozo also recognized the utility of the motion to reconsider to the misunderstood litigant:

> Can it be that he is remediless? An appeal will not aid him, for that must be

**1192**

heard upon the papers on which the motion was decided.... A grievous wrong may be committed by some misapprehension or inadvertence by the judge for which there would be no redress, if this power did not exist.

*Belmont v. Erie Ry.*, 52 Barb. 637, 641 (N.Y.App.Div.1869). The Bank was not a misunderstood litigant; the Bank was merely an irresolute litigant that was uncertain what legal theory it should pursue. The Bank never moved to amend its complaint nor did it submit an amended complaint. The district court was under no obligation to *sua sponte* amend the Bank's complaint.

Were we to construe the Bank's motion for reconsideration as containing an implicit post-judgment motion to amend the complaint, we would review the district court's decision not to allow amendment under the "abuse of discretion" standard. *Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1196 (7th Cir.1985); *United States Labor Party v. Oremus*, 619 F.2d 683, 690 (7th Cir.1980). In *Oremus*, we noted that "[d]elay in presenting the post-judgment amendment when the moving party had an opportunity to present the amendment earlier is a valid reason for a district court not to permit an amendment." 619 F.2d at 690. The plaintiff here, like the plaintiffs in *Oremus*, failed to offer any explanation for its delay in seeking an amendment to the complaint.

We also doubt whether the Bank's suggestion that the district court "enlarge the issues to be considered" could fairly be construed as a motion to amend. The normal procedure for requesting an amendment to the complaint in federal court is to file a FED.R.CIV.P. 15 motion to amend together with the proposed amendment or new pleading. *Twohy*, 758 F.2d at 1197; 3 MOORE'S FEDERAL PRACTICE ¶ 15.12 (1984). The Bank avoided the usual practice and opted to proceed indirectly by hinting in a motion for reconsideration that the district court should "enlarge the issues to be considered" to include a conversion claim. We noted in another context that "[a] district court need not scour the record to make the case of a party who does nothing."

*Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989). The Bank's oblique reference to "enlarg[ing]" the issues to be considered" to include a conversion claim presented the district court with little support for granting a post-judgment amendment of the complaint. The Bank did next to nothing in seeking an amendment and now asks us to find that the district court abused its discretion in not rewarding it with an amended complaint. In light of the Bank's failure to explain its delay in seeking amendment, although it concedes that it believed it had a viable conversion claim many months prior to judgment, we find that the district court did not abuse its discretion in declining to allow an amendment of the complaint.

The district court's entry of summary judgment in favor of the defendant is AFFIRMED.