CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, Chicago District Council of Carpenters Welfare Fund, and the Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program, Plaintiffs,

v.

VACALA MASONRY, INC., and Vacala Construction, Defendants.

No. 95 C 1293.

United States District Court, N.D. Illinois, Eastern Division.

June 3, 1997.

Matthew W. Rappleye, Brian T. Garelli, Terrence P. Canade, Lord, Bissell & Brook, Chicago, IL, for Plaintiffs.

Robert P. Casey, Dwight D. Pancottine, Peter A. Steinmeyer, Murphy, Smith & Polk, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

ASHMAN, United States Magistrate Judge.

### I. Background

The Defendants, Vacala Construction, Inc. ("VCI") and Vacala Masonry, Inc. ("VMI"), filed a motion for summary judgment, alleging that VCI was not, as a matter of law, the alter ego of VMI and was therefore not bound by the Carpenter's Union collective bargaining agreement ("CBA") signed by VMI. This Court, in a December 3, 1996 opinion, found that VMI did not have the unlawful intent to evade the terms of its collective bargaining agreement, a prerequisite to any finding of alter ego status, and thus concluded that VCI could not be deemed the alter ego of VMI. While summary judgment was appropriately granted on this basis, the Court went on to analyze the other alter ego factors and concluded that these factors also supported a finding that VCI was not the alter ego of VMI. Thus, the Court entered summary judgement in favor of the Defendants on all claims based on the alter ego doctrine. However, the Court also held that any claims the Funds ("plaintiffs") had against VMI directly for the under-reporting of hours remained (an amount of approximately $2,500). The Plaintiffs then filed this motion to reconsider.

### II. Facts

Because all of the facts from the Court's December 3, 1996 opinion are relevant to this

motion, the statement of facts from that opinion is set out below.

The collective bargaining agreement (CBA) at issue in this case prohibits employers, covered by the agreement, from, inter alia, subcontracting jurisdictional work to non-union subcontractors. (Funds' 12(N) Statement, ¶ 5). If an employer, bound by the CBA, hires a non-union subcontractor to perform jurisdictional work, the employer must either (1) require the subcontractor to be bound by the terms of the agreement or (2) assume responsibility for reporting the hours worked by the subcontractor's carpenters and for paying contributions to the Funds based on those hours. (Funds' 12(N) Statement, ¶ 5). Consequently, if VCI is the alter ego of VMI, VCI would be subject to the terms of the collective bargaining agreement, and would thus owe the Funds money for contributions it would have been obligated to make under the terms of that agreement for any non-union employees who performed work within the scope of the union's jurisdiction. Additionally, VCI would be obligated to allow the Funds to audit its books as part of the Funds' periodic audits.

VCI and VMI are owned by Pat and Chuck Vacala.[1] (Defendants' 12(M) Statement, ¶¶ 12–13, 20–22, 30; Funds' Response to Defendants' 12(M) Statement ("Funds' Response"), ¶¶ 12–13, 20–22, 30). Pat is the sole shareholder and President of VCI while Chuck and Pat are the majority shareholders[2] of VMI. VCI was incorporated in 1980 and has operated as a general contractor at all relevant times. (Defendants' 12(M) Statement, ¶¶ 12, 14–15; Funds' Response, ¶¶ 12, 14–15). VCI has never been a signatory to any union agreements and has never executed any agreement with the Carpenter's Union. (Defendants' 12(M) Statement, ¶ 17; Funds' Response, ¶ 17).

Until recently, Chuck Vacala was VMI's President and Pat Vacala was VMI's secretary.[3] (Defendants' 12(M) Statement, ¶ 22; Funds' Response, ¶ 22). As VMI's president, Chuck Vacala was responsible for the day-to-day running of VMI, including the bidding on, obtaining, scheduling, and overseeing of all jobs and the hiring and firing of all employees. (Defendants' 12(M) Statement, ¶ 24; Funds' Response, ¶ 24). Pat Vacala's involvement with VMI's operations was limited to signing checks and other papers when Chuck was not available, providing general business advice when asked and meeting with Chuck on a monthly basis to review the financial performance of VMI. (Defendants' 12(M) Statement, ¶¶ 27–29; Funds' Response, ¶¶ 27–29).

Chuck Vacala worked for VCI from its inception until 1990, when he broke off to form his own company, VMI, to perform work as a masonry subcontractor. (Defendants' 12(M) Statement, ¶¶ 2, 12, 20; Funds' Response, ¶¶ 2, 12, 20). Although Pat helped Chuck form VMI, Chuck ultimately intended to buy out his brother's interest. (Defendants' 12(M) Statement; ¶ 21; Funds' Response, ¶ 21). Chuck ran VMI out of his house and from the field until 1995, when VMI acquired its own formal office space by renting space from Pat. (Defendants' 12(M) Statement; ¶ 31; Funds' Response, ¶ 31). During the time VMI was being run out of Chuck's home and thereafter, VCI's office staff helped VMI with its paper work, billing VMI for any time thus spent. (Defendants' 12(M) Statement, ¶¶ 58–60, 64; Funds' Response, ¶¶ 58–60, 64).

VMI has been a signatory to agreements with the Laborer's and Bricklayer's Unions from its incorporation, but did not become signatory to the agreement with the Carpenter's Union at issue in this case until October of 1993. (Defendants' 12(M) Statement,

---

1. Pat and Chuck are two of the eight Vacala brothers. (Defendants' 12(M) Statement, ¶¶ 8–10). All of the Vacala brothers grew up working in the construction industry and, at one time or another, all of them have worked for VCI. (Defendants' 12(M) Statement, ¶¶ 9–12).

2. Each owns 49% of VMI's stock, with their brother, Vince, owning the remaining 2% of the stock. (Defendants' 12(M) Statement, ¶ 30).

3. Chuck Vacala was relieved of his duties as President of VMI in February of 1996 due to personal problems and was replaced by J. Bennett, who still currently holds that position while Chuck remains on as VMI's Secretary. (Defendants' 12(M) Statement, ¶ 25).

¶¶ 2–3, 23, 36; Funds' Response, ¶¶ 2–3, 23, 36). VMI became signatory to the Carpenter's Union agreement in an effort to assist one of VCI's employees, Dean Pfaff. (Defendants' 12(M) Statement, ¶ 42; Funds' Response, ¶ 42). Pfaff, a member of the Carpenter's Union, was hired by VCI in early 1993. (Defendants' 12(M) Statement, ¶ 38; Funds' Response, ¶ 38). Pfaff knew that VCI was not a signatory to the Carpenter's Union agreement when he began to work for VCI; however, at some point, he expressed concern about losing his union benefits. (Defendants' 12(M) Statement, ¶ 39; Funds' Response, ¶ 39).

Pat and Chuck discussed this problem and came up with a solution that would be beneficial to both VMI and VCI. (Defendants' 12(M) Statement, ¶¶ 40–41; Funds' Response, ¶¶ 40–41). Pursuant to this discussion, VMI became signatory to an agreement with the Carpenter's Union and Pfaff went to work for VMI. (Defendants' 12(M) Statement, ¶ 40; Funds' Response, ¶ 40). VMI also hired additional union carpenters and then leased Pfaff and the others back to VCI on an as needed basis. (Defendants' 12(M) Statement, ¶¶ 40–41; Funds' Response, ¶¶ 40–41). This arrangement enabled Pfaff to retain his benefits and allowed VMI to maintain its own contingent of carpenters, which it could then lease to VCI. (Defendants' 12(M) Statement, ¶¶ 40–41; Funds' Response, ¶¶ 40–41).

Most of the work performed by VMI's carpenters was done under the leasing agreement with VCI. (Funds' 12(N) Statement, ¶ 13; Defendants' Response, ¶ 13). When VMI employees were leased to VCI, they worked under the supervision of VCI superintendents, who directed their work. (Defendants' 12(M) Statement, ¶ 55; Funds' Response, ¶ 55). Additionally, when VCI leased employees from VMI to perform work at construction sites where VCI was the general contractor, VCI occasionally provided tools for the leased employees when the need arose. (Funds' 12(N) Statement, ¶ 10; De-

fendants' Response to Funds, 12(N) Statement ("Defendants' Response"), ¶ 10).

Work done for VCI represents a sizable portion of VMI's income. From 1990–1993, approximately 50% of VMI's work was the result of subcontract work done under lease to VCI. (Defendants' 12(M) Statement, ¶ 77; Funds' Response, ¶ 77). In 1994, VMI completed four jobs worth approximately $680,-000, three of which were jobs where VCI was the general contractor. (Defendants' 12(M) Statement, ¶ 78; Funds' Response, ¶ 78). Through October 31, 1995, VMI had completed 18 jobs totaling approximately $524,000, with VCI the general contractor on 7 of the 18 jobs. (Defendants' 12(M) Statement, ¶ 79; Funds' Response, ¶ 79). However, VCI was the general contractor on all twelve of the jobs in progress as of October 31, 1995. (Funds' 12(N) Statement, ¶ 12; Defendants' Response, ¶ 12). From October 1, 1993 until September 30, 1995, VCI paid VMI $758,-915.09. (Funds' 12(N) Statement, ¶ 12; Defendants' Response, ¶ 12). During this same period, VCI paid VMI $19,957 for leased non-supervisory employees and $68,645 for leased carpentry employees. (Funds' 12(N) Statement, ¶ 12; Defendants' Response, ¶ 12).

VMI also received monetary advances from VCI, which was the only company to give VMI this type of cash advance. (Funds' 12(N) Statement, ¶ 19; Defendants' Response, ¶ 19). Other general contractors paid VMI only after the general contractor itself was paid. (Funds' 12(N) Statement, ¶ 19; Defendants' Response, ¶ 19). However, any advances VCI made to VMI were always repaid. (Defendants' 12(M) Statement, ¶ 72; Funds' Response, ¶ 72).

Whenever VMI leased employees to VCI, VMI paid the required contributions to the Carpenter's Union fringe benefit funds for all hours worked by those employees while leased to VCI. (Defendants' 12(M) Statement, ¶ 54; Funds' Response, ¶ 54). However, Plaintiffs contend that Defendants owe them $107,937.67 in unpaid contributions.[4]

4. This Court notes that the affidavit supporting these statements is one of the subjects of the Defendants' motion to strike, based on Defendants' contention that the audit report referred to in the affiant's statement is hearsay, conclusory

in nature and that the affidavit reflects the opinion of the affiant about the existence of delinquencies but is not proof thereof. The Court need not address each of the contentions raised by the Defendants' motion to strike; it is sufficient to

(Funds' 12(N) Statement, ¶ 7). This breaks down to $105,424.50 in contributions Plaintiffs claim VCI, if found to be VMI's alter ego, would owe for jurisdictional work performed by non-union individuals and subcontractors employed by VCI and $2,512.33 in contributions Plaintiffs claim VMI owes in its individual capacity for allegedly under-reporting hours worked by two of its own employees in October, November and December of 1993. (Funds' 12(N) Statement, ¶¶ 7–8; Funds' Response, ¶ 49).

### III. *Standard of Law*

■ Motions for reconsideration are not intended to give the moving party a second bite of the apple. Rather, such motions " 'serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence'." *Publishers Resource v. Walker–Davis Publications*, 762 F.2d 557, 561 (7th Cir.1985) (citations omitted). Thus, the moving party may not merely reargue the same evidence or cases previously argued, or argue other evidence or cases previously available but not initially argued. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); *Jefferson v. Security Pacific Financial Services*, 162 F.R.D. 123, 124 (N.D.Ill. 1995). Instead, the movant must either demonstrate that the court made manifest errors of law or fact in reaching its decision or must proffer new evidence in support of its motion for reconsideration. *Id.* With this guidance in mind, the Court now proceeds to the arguments advanced by the Plaintiffs.

### IV. *Analysis*

The Plaintiffs submit two arguments in support of their motion for reconsideration. First, Plaintiffs contend that, based on this Court's misapprehension of the applicable legal standard for determining whether the Defendants had the requisite unlawful intent, the Court erroneously concluded that VMI did not possess the unlawful intent necessary to hold VCI its alter ego. Second, Plaintiffs argue that the Court made manifest errors of fact in concluding that the other alter ego

note that the Court has relied only upon relevant, admissible evidence in reaching its opinion in

factors supported the finding that VCI was not VMI's alter ego. Each argument will be addressed below.

### A. Whether The Defendants Have The Requisite Unlawful Intent

■ Plaintiffs first take issue with the Court's finding that VCI was not VMI's alter ego based on the Court's conclusion that VMI lacked the requisite unlawful intent to avoid the terms of its CBA. Plaintiffs contend that this Court's finding was based on an erroneous determination that the alter ego doctrine did not apply because VCI, the non-union company was in existence prior to the formation of VMI, the union signatory. Arguing that VMI and VCI structured their operations side-by-side in such a manner as to allow VCI to employ both union and non-union carpenters while avoiding the obligations mandated by the CBA, the Plaintiffs assert that it is irrelevant which alter ego company was formed first. The Plaintiffs then spend several pages of their brief refuting this Court's alleged holding, citing many cases in support of the proposition that the alter ego doctrine applies to interrelated companies operating side-by-side in order to avoid the signatory's CBA obligations.

Interestingly, Plaintiffs cite *Chicago District Council of Carpenters v. CGI Contracting, Inc.*, 1996 WL 66008 (N.D.Ill.1996), a case this Court relied upon in reaching the conclusion that VCI is not VMI's alter ego. Although Plaintiffs apparently overlooked this case in their response to Defendants' motion for summary judgment, they now cite it in support of their motion for reconsideration, claiming that the two factors which inspired the *CGI* court to deny the defendants' cross-motion for summary judgment in that case are also present here.

In *CGI*, the court found that the alter ego doctrine focused only on whether a non-signatory company was being used by the signatory to avoid its obligations under a CBA, rather than on whether a non-signatory company avoided the need to sign a CBA by having an affiliate sign such an agreement.

this case.

1996 WL 66008 at *4–5. In reaching this conclusion, the *CGI* court properly noted that the defendants could not have attempted to remove the non-signatory company from the scope of the CBA because it was never subject to the terms of the agreement in the first place. 1996 WL 66008 at *4.

However, in spite of this finding, the court denied the defendants' cross-motion for summary judgment based on the presence of two factors which the court felt created a genuine issue of material fact as to whether the signatory company used the non-signatory company to evade its CBA obligations. *Id.* at *4–5. These two factors were (1) the fact that an ex-CGI union employee performed carpentry work for and was paid directly by the non-signatory company who did not report the hours to the trust funds or make any contributions on the union employees's behalf and (2) the fact that one of the defendants mislead the auditor about the relationship between CGI and Components (the non-signatory), by claiming that Components was a marketing company rather than a general contractor. *Id.* at *5.

Although Plaintiffs never alleged that Defendants attempted to mislead them in their response to the Defendants' motion for summary judgment, Plaintiffs now contend that Pat Vacala attempted to hide the fact that "VCI was running its own carpenters during the period of VCI's and VMI's side-by-side operation." Plaintiffs base this contention on the fact that Pat Vacala stated in a deposition that VCI did not employ any carpenters, while a VCI employee, Jim Doherty, testified that he performed carpentry work for VCI as a VCI employee. Plaintiffs contend that Jim Doherty performed carpentry work an average of 20% of his time for VCI while employed as a laborer from October 1993 through February 1996. Plaintiffs claim that Pat Vacala later changed his testimony by conceding, in an affidavit, that VCI employed carpenters to perform "small parts of work on a job."

The Plaintiff's motion is predicated, in part, on a misconception regarding the Court's holding. Contrary to the Plaintiffs' assertions, this Court did not hold the alter ego doctrine inapplicable when a non-signatory company is in existence prior to the signatory and the two companies operate side by side. To the contrary, the Court stated the exact opposite conclusion. On page 12 of its December 3, 1996 opinion, the Court stated:

> [w]hile this case obviously does not fit into the typical situation whereby a union company dissolves itself and reemerges as a non-union company in order to circumvent compliance with its obligations under a preexisting collective bargaining agreement, **'the alter ego doctrine is also applicable in situations in which the entity exists side-by-side with its alleged alter ego.'** *Duguid,* 761 F.Supp. at 1348.

Thus, the Court clearly acknowledged that the alter ego doctrine applies, just as Defendants assert, to companies operating side-by-side with their alleged alter ego. To the extent that the Plaintiffs' motion for reconsideration is predicated on its misconception of this Court's earlier holding, the motion is denied.

The Plaintiffs' argument regarding the presence in this case of the two factors relied upon by the CGI court also lacks merit. Before addressing the substance of the Plaintiffs' arguments on this point, the Court finds it interesting to note that the Plaintiffs, who are now contending that their case is on all fours with *CGI,* never even cited this case in their original response, despite the fact that the same attorneys handled the *CGI* case for the Funds, who were also the plaintiffs in that case. Furthermore, the evidence proffered by Plaintiffs in support of the existence of the two factors relied upon by the *CGI* court was available at the time the Plaintiffs filed their response to the Defendants, motion for summary judgement; however, Plaintiffs elected not to rely on this evidence in that submission. On that basis alone, the Court could properly disregard the evidence now advanced. However, to address the merits of the argument, the Court analyzes the value of the evidence and the attendant arguments below.

The Plaintiffs never attempted to argue that they were mislead about the relationship between the two companies in their original motion, as occurred in *CGI.* Instead, Plaintiffs' contend that Pat Vacala lied and at-

tempted to mislead them regarding VMI's employment of carpenters. However, the evidence does not support this conclusion. VCI, as Pat stated, did not employ carpenters at the time the deposition was taken. During the deposition, Pat was asked the following question and gave the following answer:

**Q:** On your job sites, what sort of tools do you expect your carpenters to bring for themselves to use?

**A:** I don't have any carpenters. Our leased carpenters?

Pat's deposition testimony does not conflict with Doherty's testimony because Doherty testified that he was hired as a laborer, not as a carpenter, and did only occasional carpentry work to fill in the gaps on some projects. Additionally, ten months prior to Pat's deposition, Doherty was promoted to the position of superintendent and performed no carpentry work at any time thereafter for VCI. Thus, not only was Doherty never hired as a carpenter by VCI, he was not performing any kind of carpentry work whatsoever at the time of Pat Vacala's deposition. Clearly, no conclusion can be drawn from the above facts that Pat Vacala "lied" about his employment of carpenters at the time of the deposition.

Furthermore, even if Pat Vacala did employ carpenters, this is not the type of deception that occurred in the *CGI* case. In *CGI*, the General Contractor allegedly attempted to deceive the auditor about the relationship between it and its non-signatory counterpart, Components, by lying about CGI's line of business. Specifically, CGI told the auditor that it was in the marketing business, rather than the general contracting business. 1996 WL 66008 at *4. In this case, VCI never attempted to mislead anyone about either the type of business in which it engages and the type of business engaged in by VMI or about the relationship between the two companies.

Plaintiffs' further argue that, just as in *CGI*, VMI attempted to divert union work to VCI in order to avoid its obligations under the CBA. In *CGI*, the court found that an

EX–CGI employee, who was a member of the carpentry union, performed carpentry work for Components (the non-union company) on Component's payroll and that these hours were never reported to the union. 1996 WL 66008 at *4–5. Thus, the court concluded that there was some evidence that the defendants' intended to use Components to avoid CGI's obligations under the CBA. *Id.* at *5.

Here, Plaintiffs' allege that VCI employed two people who performed carpentry work for VCI; namely, Jim Doherty and Tom Malone. Plaintiffs attempt to draw a parallel between VCI's employment of these two individuals and Components' employment of the ex-CGI union carpenter in the *CGI* case. However, Jim Doherty was hired as a laborer rather than as a carpenter and, while he did a small amount of carpentry work when needed, Doherty was not a member of the carpenter's union. While Malone worked as a carpenter for VCI for a one-month period, Malone was also not a member of the carpenter's union. In this case, **neither Doherty nor Malone were union members while employed by VCI.** Consequently, this evidence does not support the inference that VMI attempted to divert work[5] to the VCI, non-union company, in order to avoid making contributions on behalf of one of VMI's former **union** employees.

The only evidence that could potentially support any inference of unlawful intent on VMI's behalf arises from the fact that, in October and November of 1993, two union carpenters who were former VCI employees went to work for VMI. During that two month period, the employees remained on VCI's payroll. Consequently, VMI never reported to the union the hours worked by those two employees in October and November. However, Defendants explained that this reporting error was the result of administrative complications with the transfer of the paper work on the two employees in question. in assessing this evidence, it is significant that the union agreement was signed October 1, 1993. Thus, the reporting error

---

5. In *CGI*, the court was concerned that by, in effect, transferring a union employee to Components' payroll, CGI was diverting union work to the non-union company to avoid paying union contributions for the transferred union employee.

occurred in the very initial stages of the relationship between VMI and the union, when VMI was just beginning the process of transferring employees from VCI to VMI and was just instituting procedures to handle the reporting of hours and the other paper work associated with its union reporting requirements. Furthermore, over the next two years, VMI never made such a reporting error again and consistently reported to the union the hours worked by its union employees while leased to VCI. Based on the totality of the evidence, the Court finds VMI's failure to report these two employees' hours for two months in the very initial stages of the signatory relationship insufficient to allow a rational jury to conclude that the VMI had any unlawful motive. Based on this conclusion, the Court granted the Defendants' motion for summary judgment. On reconsideration, Plaintiffs have presented nothing to alter this Court's initial conclusion.

Plaintiffs also cite to *B.A.F., Inc.*, 302 N.L.R.B. 188, 1991 WL 62425 (1991), to support their argument that, under the facts of this case, VCI should be held liable as the alter ego of VMI. The Court first notes that, *B.A.F.* is authority that Plaintiffs could have relied on in their response to the Defendants' motion for summary judgment had they opted to do so. Further, *B.A.F.* does not even address the issue of intent and is also factually distinguishable from the instant case in significant ways, including that, in *B.A.F.,*: (1) the signatory company failed to make numerous payments it was obligated to make under its CBA which, when finally made, were made by the owner of the non-signatory company and (2) the owner of the non-signatory was responsible for handling all of the labor relations with the union on behalf of the signatory company. 1991 WL 62425 at *5–9. Thus, the Court concludes that *B.A.F.* is not even persuasive authority with respect to the case at bar.

Finally, Plaintiffs argue that the whole "leasing scheme" is, in and of itself, evidence of VMI's intent to avoid its potential subcontracting liability under the CBA by allowing VCI to make all the subcontracting arrangements on jobs where VMI provided the car-

pentry work. The terms of the CBA provide in Art. III, § 3.2:

> EMPLOYER shall not contract or subcontract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a Collective Bargaining Agreement with the UNION, provided, however, that the provisions of this paragraph shall apply only to the contract and subcontracting of work to be done at the site of construction .... of a building, structure, or other work.

Additionally, § 3.5 provides:

> **If an EMPLOYER, bound by this agreement,** contracts or subcontracts any work covered by this agreement to be done at a job site ... to any person ... who is not signatory to this agreement, the EMPLOYER shall require such subcontractor to be bound by all the provisions of this agreement, or the EMPLOYER shall maintain daily records of the subcontractors or contractors Employees' job site hours and be liable for payments to the.... Funds, as provided by Articles XII, XIII, and XIV of this agreement. (emphasis added).

Essentially, Plaintiffs argue that, by allowing VCI, an employer not bound by the agreement, to do all of the subcontracting on various construction sites, VMI avoided having to meet its subcontractor obligations. However, the clear wording of the contract, written by the Funds and thus construed against them, operates only to prevent employers **bound by the Agreement** from subcontracting work to any non-union workers or subcontractors working within the Union's jurisdiction unless the employer makes the required contributions on their behalf.

In this case, VMI, the employer bound by the agreement, never subcontracted any work to non-union employees and thus never violated the terms of the agreement. VCI, on the other hand, may have used non-union subcontractors or workers. However, VCI is not bound by the terms of the agreement, and therefore did not violate the CBA's terms by using non-union employees. The only way VCI could be bound by the CBA is upon a finding that VCI is VMI's alter ego. The Plaintiffs apparently would have this

Court put the cart before the horse by inferring unlawful intent and alter ego status from the fact that a company (VCI), not bound by the terms of the CBA, violated the agreement by not complying with its terms. However, it is only after the Court concludes that the signatory, VMI, attempted to evade its CBA and thus finds VCI the alter ego of VMI, that the Court could conclude that VCI violated the provisions at issue.

Based on the above analysis, the Court once again finds that there is no evidence from which a rational jury could determine that VMI possessed the unlawful intent essential to the invocation of the alter ego doctrine. The instant case does not present the same factors that lead the CGI court to find a genuine issue of material fact regarding the signatory's intent, nor have Plaintiffs cited any other case which would allow this Court to finds such an issue of material fact on the evidence presented here. The Court reiterates its earlier holding in stating that VMI did not unlawfully intend to avoid the obligations of its CBA. Consequently, the Court will not hold VCI to be VMI's alter ego and the Plaintiffs' motion for reconsideration on this issue is therefore denied.

## B. Miscellaneous Arguments On Intent

■ Under the alter ego doctrine, two nominally distinct employers will be deemed a single entity to prevent an employer from gaining an unearned advantage in his labor activities. *Central States Pension Fund v. Sloan,* 902 F.2d 593, 596 (7th Cir.1990). Plaintiffs, in their reply brief, argued that the Court misapplied the alter ego analysis by making the improper inference that VCI and VMI were two separate companies. Plaintiffs contend that this Court should instead assume, for purposes of the intent analysis, that there was but one employer, rather than assuming that the companies were operating as two independent, individual entities.

■ Plaintiffs would have this Court assume, as a starting point in its analysis, the ultimate conclusion of the alter ego doctrine, namely that there is "but one employer."

However, it is only after the Court concludes that the signatory possessed the unlawful intent to evade the terms of its CBA that such a conclusion is made. To assume that there is but one employer or company as a starting point in the intent analysis would shift the burden of proof onto the Defendants to prove that the two companies were, in fact, separate and distinct entities.

Once again, the Plaintiffs turn the alter ego doctrine on its head. Rather than proving that the signatory possesses the unlawful motive to evade its CBA, thus resulting in a finding of one employer, the Plaintiffs would have this Court assume from the start that the two companies were one employer, thus forcing the Defendants to prove the opposite. This argument is contrary to the very spirit of the alter ego doctrine. Although the Plaintiffs are correct in asserting that the Court must focus on the activities of both companies, the purpose for this dual focus is to ascertain the intent of the **signatory** to determine whether it is attempting to evade its obligations under the CBA. The Plaintiffs' argument holds no more merit than their original argument on the intent issue and thus does not alter the outcome of the Court's initial holding.

## C. Analysis of the Other Five Alter Ego Factors

Finally, the Plaintiffs argue that an analysis of the five remaining alter ego factors[6] also supports a finding that VCI was the alter ego of VMI. By and large, Plaintiffs repeat the facts set forth in their original motion and argue that the Court made manifest errors of fact, thereby reaching the wrong conclusion. For the sake of brevity, the Court will only discuss those facts it finds critical to the analysis of each factor.

### 1. *Common Management or Supervision*

■ Plaintiffs argue that Pat Vacala (VCI's President) hired at least four of the VMI carpenters whose involvement is critical to this case. Plaintiffs contend that this

---

**6.** The five remaining alter ego factors include: 1) common management or supervision; 2) common ownership; 3) same business purpose; 4) identical business operations; and 5) shared equipment.

Court's conclusion to the contrary is unsupported by the evidence. To buttress this contention, Plaintiffs point to the fact that Dean Pfaff was hired as a carpenter for VCI and was later transferred to VMI and that Doug Hawk was similarly initially hired by VCI and then transferred to VMI. Plaintiff contends that, until the end of 1994, the only carpenters employed by VMI were those hired by Pat Vacala.

Additionally, Plaintiffs rely on the common supervision that occurred on job sites were VCI was the general contractor and VMI was the carpentry subcontractor and on the fact that some of the VMI employees allegedly saw Pat Vacala far more often than they saw Chuck Vacala (VMI's past president). Plaintiffs contend that, under the leasing agreement, VCI determined when the carpenters would work, where they would work and on what jobs they would work. Thus, Plaintiffs contend that virtually all supervision of the VMI employees was done by VCI.

The evidence, taken at face value, establishes that Pat Vacala hired three carpenters to work for VCI before VMI signed the CBA with the Carpenter's Union. These employees worked for some period of time for VCI. Pfaff, for example worked for approximately nine to ten months for VCI. Once VMI signed the CBA, the employees transferred to VMI. Thus, there is no evidence that Pat hired employees **for** VMI. Plaintiffs apparently would have this Court infer that the above sequence of events was a scheme whereby Pat was actually hiring for VMI under the guise of hiring for VCI. However, there is no evidence to support the deceptive motive Plaintiffs attribute to Pat Vacala's hiring practices.

Additionally, it is undisputed that "Pat has never directed VMI employees, fired VMI employees or been on VMI's payroll" (Plaintiffs' Response to Defendants' 12(M) Statement, ¶ 27). With respect to the supervision, VMI had several supervisors (Pfaff and Schaumbach) who sometimes supervised the VMI employees on VCI job sites. Plaintiffs themselves make this argument on page 5 of their opening brief:

Under this [leasing] arrangement, VMI was the source of skilled supervisors overseeing job site work. However in their capacity as "leased" union employees, these VMI carpenters supervised VCI jobs....

Thus, Plaintiffs cannot now seriously contend that VMI employees were supervised only by VCI supervisors. Further, to the extent VMI employees were supervised by VCI's supervisors, this Court has already concluded that the supervision which occurred was the supervision that general contractors normally exercise over their subcontractors on any given job site. The Court's initial finding that there was insufficient evidence to raise a genuine issue of material fact on the issue of common management is therefore supported by the evidence.

2. *Same Business Purpose*

■ This Court relied on *Board of Trustees of the Chicago Plastering Institute Pension Trust Fund v. Duguid*, 761 F.Supp. 1345 (N.D.Ill.1991) for the proposition that a general contractor and a subcontractor who are both in the construction industry and who both have employees performing some of the same type of work on a job site do not share the same business purpose because there is a distinction in the scope and purpose of each company's work. Plaintiffs contend that this reliance is misplaced because, in the instant case, "VMI's and VCI's work is largely on the same job sites for the same customers."

In the *Duguid* case, the plaintiffs alleged that over three fourths of the subcontracting company's work was obtained from Duguid, the general contractor. 761 F.Supp. at 1347. Thus, in that case, as in this case, the vast majority of the subcontractor's work was for one general contractor. The Plaintiffs' attempt to distinguish the instant case from *Duguid* therefore falls short and this Court again concludes that the two companies have different business purposes.

3. *Identical Business Operations*

■ Plaintiffs argue that the two companies have identical business operations for four reasons: (1) the majority of VMI's work is performed for VCI; (2) VCI loans and advances money to VMI; (3) VCI and VMI

were run out of the same office; and (4) VMI and VCI shared the same office staff.

First, Plaintiffs contend that, as of October 31, 1995, 100% of VMI's jobs in progress were for VCI, and that, in 1994, three of the four completed jobs, constituting 90% of the finished work, were done for VCI. Additionally, Plaintiffs argue that VCI loaned and advanced significant amounts of money, totaling over $200,000, to VMI in less than arms length transactions.

Next, Plaintiffs allege that, for the entire time VMI was in existence and was run out of an office, the address VMI listed on documents was the same as that for VCI. Plaintiffs state that Defendants never produced a copy of any lease agreement for the period when VMI leased office space from Pat and further state that only one rent payment was recorded on VCI's general ledger. Finally, Plaintiffs state that VMI and VCI shared the same office staff from October 1993 until July 1995.

As to VMI's alleged financial dependence on VCI, from 1990–1993, 50% of VMI's work was done for contractors other than VCI. Through October 31, 1995, VMI had completed 18 jobs totaling $524,000. VCI was the contractor on only 7 of the 18 jobs. Finally, all advances made by VCI to VMI were repaid.

As Plaintiffs' admitted in their 12(N), for most of VMI's existence, the company was run out of Chuck's home. While VMI may have used VCI's mailing address to enable Nan Hoste to handle VMI's paperwork (a service for which VMI paid VCI), this does not refute the evidence that VMI was located in Chuck's home and later located in an office in the same building occupied by VCI.

As this Court correctly concluded in its initial decision, there is insufficient evidence that VMI was financially dependent on VCI for its continued existence or that the two companies shared the same facilities and functioned jointly on a daily basis to raise a genuine issue of material fact on this factor.

#### 4. *Shared Equipment*

█ Plaintiffs reiterate the same arguments advanced in their response to the De-

fendants' motion for summary judgment, namely, that VCI provided VMI carpenters with equipment and that VCI allowed VMI to use its office equipment. Plaintiffs cite to *B.A.F.* where the court concluded that this alter ego factor was met because B.A.F. did not have its own equipment, but instead, used the equipment of the non-union general contractor.

The Court reiterates its earlier conclusion in finding that there is no genuine issue of material fact with respect to this alter ego factor. In this case, VMI owns its own equipment, thus distinguishing it from *B.A.F.* While VMI may have sometimes used VCI's equipment if necessary, this does not establish that VMI was dependent on VCI for all of its equipment or material needs. Additionally, while VMI sometimes used VCI's office equipment, when VMI moved into its own office, it maintained its own phone and fax line, and had a small copier, a fax machine, desks, chairs and a drawing board. (Defendants' 12(M) Statement, ¶ 62). Thus, VMI had its own office and work equipment and the Court appropriately determined that there was no genuine issue of material fact with respect to this factor.

#### 5. *Common Ownership*

Both parties agreed and this Court concluded in its initial opinion that the common ownership factor was satisfied based on Pat and Chuck Vacala's co-ownership of VMI and Pat Vacala's sole ownership of VCI. No further argument was offered by either of the parties on this issue in connection with the Plaintiffs' motion to reconsider. Thus, the Court's initial decision with respect to this factor stands.

### V. *Conclusion*

After reviewing the evidence and arguments offered by the Plaintiffs in support of their instant motion, the Court finds no basis to reconsider its December 3, 1996 opinion. Consequently, for all of the reasons discussed above, the Plaintiffs' motion for reconsideration is denied.